**HI–STATE BEVERAGE COMPANY, Appellant,**

v.

**OHIO BUREAU OF EMPLOYMENT SERVICES et al., Appellees.**

[Cite as *Hi–State Beverage Co. v. Ohio Bur. of Emp. Serv.* (1991), 77 Ohio App.3d 633.]

Court of Appeals of Ohio,
Franklin County.

No. 91AP–118.

Decided Oct. 10, 1991.

*Schottenstein, Zox & Dunn, David A. Kadela* and *James M.L. Ferber*, for appellant.

*Lee Fisher,* Attorney General, *Cordelia A. Glenn* and *Stefan J. Schmidt,* for appellees.

HOOPER, Judge.

Appellant, Hi–State Beverage Company ("Hi–State"), appeals the decision of the Franklin County Court of Common Pleas, affirming the decision of the Unemployment Compensation Board of Review ("board"), which allowed all of claimants' claims for unemployment compensation.

On June 1, 1987, employees of Hi–State, represented by Teamsters Local 284 ("Union"), went on strike after failure to negotiate a new contract on the expiration of the existing one. The strike arose primarily from Hi–State's implementation of a different method of sales and delivery of its products which would eliminate a large portion of the drivers-helpers' job description and concomitant pay. In March 1987, at the inception of the renegotiation of the expiring labor contract between Hi–State and the Union, Hi–State proposed that the drivers-helpers be compensated solely on the basis of hourly wage as opposed to the previous combination of hourly wages and commission on sales.

The Union opposed the elimination of commissions as a part of the drivers-helpers' compensation and refused to negotiate on the issue. Originally offering $10 per hour compensation, on April 28, 1987, Hi–State, in a stated attempt to break the impasse in negotiations, increased its offer of an hourly wage by $.25 per hour. The Union rejected this offer, and no further negotiations were conducted. As stated, on June 1, 1987, the employees went out on strike against Hi–State.

During the strike, fifty-seven of the employees filed unemployment compensation claims. Originally, in October 1987, the Administrator of the Ohio Bureau of Employment Services ("OBES") denied the claims for first weekly benefits, finding the claimants were unemployed during a labor dispute other than a lockout. R.C. 4141.29(D)(1)(a). Upon request for reconsideration, in

December 1987, the Administrator of OBES certified the claims to the board as a mass appeal.

In April 1988, the balance of claims for subsequent weeks of unemployment was allowed, the administrator finding that the labor dispute had ended on June 19, 1987. Upon request for reconsideration by Hi–State, the administrator certified Hi–State's and claimants' appeals to the board as a mass appeal. The board conducted a hearing held on October 5, 1987. As a result of that hearing, the board held that Hi–State had locked the claimants out and, further, since the employees had been replaced, their unemployment was due to lack of work, not a labor dispute.

The decisions of the board were timely appealed to the Franklin County Court of Common Pleas. On January 3, 1991, the court found that the board's decisions were supported by credible evidence and based upon a proper application of the law; it affirmed the decision of the board. It is from that decision that this appeal arose.

■ Assignment of error number one states:

"The common pleas court erred by affirming the board's holding that the claimants were initially separated from the company's employ as a result of a lockout."

R.C. 4141.29(D)(1)(a) provides in pertinent part:

"(D) Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits under the following conditions:

"(1) For any week with respect to which the administrator finds that:

"(a) His unemployment was due to a labor dispute *other than a lockout* * * *." (Emphasis added.)

In *Zanesville Rapid Transit, Inc. v. Bailey* (1958), 168 Ohio St. 351, 354, 7 O.O.2d 119, 121, 155 N.E.2d 202, 205 the court defined "lockout" as:

"A lockout has been defined as a cessation of the furnishing of work to employees or a withholding of work from them in an effort to get for the employer more desirable terms. *Iron Molders' Union v. Allis–Chalmers Co.*, 166 F., 45, 52 [1908], 20 L.R.A. (N.S.), 315, 91 C.C.A., 631; 25 Words and Phrases, 566; 33 Ohio Jurisprudence (2d), 189, Section 65."

The court in *Bays v. Shenango Co.* (1990), 53 Ohio St.3d 132, 559 N.E.2d 740, quoted with approval the definition of "lockout" contained in *Zanesville*, but then enlarged upon the bases for determining if a lockout exists by adopting the "status quo" test first espoused in *Erie Forge & Steel Corp. v. Unemp. Comp. Bd. of Review* ("Vrotney Unemployment Compensation Case") (1960), 400 Pa. 440, 163 A.2d 91, and adopted by the court of appeals in *Oriti*

*v. Bd. of Review* (1983), 7 Ohio App.3d 311, 7 OBR 394, 455 N.E.2d 720. The "Vrotney" test holds that:

" * * * [W]here employees offer to continue working under the terms of a pre-existing collective bargaining agreement pending final settlement of a labor dispute, the failure of the employer to accept such an offer constitutes a lockout unless it is demonstrated that the employer has a compelling reason for failing to so agree such that the extension of the contract would be unreasonable under the circumstances." *Id.*, 7 Ohio App.3d at 314, 7 OBR at 398, 455 N.E.2d at 724.

The court in *Bays, supra,* at 135, 559 N.E.2d at 743, adopted the "status quo" addition to the tests to determine if a lockout existed by holding:

"The status-quo test requires that actions of both the employer and the union be scrutinized in order to ascertain whether the parties sought to maintain the status quo. 'Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.' *Philco Corp. v. Unemp. Comp. Bd. of Review* (1968), 430 Pa. 101, 103, 242 A.2d 454, 455.

" * * *

" * * * An employer deviates from the status quo if it refuses to allow work to continue for a reasonable time *under the existing terms and conditions of employment while negotiations continue.* * * *

" ' * * * [D]etermination of which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing, must be made in order to conclude whether work stoppage was the result of a strike or lockout. * * * ' (Emphasis deleted.) (Citation omitted.) *Lozaro v. Commw. Unemp. Comp. Bd. of Review* (1985), 91 Pa.Commw. 428, 431–432, 497 A.2d 680, 682."

The board, in its decisions, granting the claims of the claimants, both in its findings of fact and in the reasons stated for granting the claims, made a specific finding that " * * * [p]ending resolution, the union was willing to continue to work under the old contract. These proposals were rejected by the company." Based upon the finding of fact of the alleged offer to continue to work, the board then applied the status quo test and held, on page 6 of its decision:

" * * * Although the union offered to continue working under the old contract pending resolution of a new contract, this was rejected by the company and the new terms of employment were to be instituted, regardless of any negotiations, effective June 1, 1987."

Then, citing *Zanesville* and *Oriti* for the proposition that the employer had not maintained the status quo and, further, to justify the failure to maintain the status quo that the employer had made no allegations that any loss had been incurred and, further, that no reason had been shown by the employer for the change other than efficiency of delivery, the board held that those reasons did not constitute a compelling reason as contemplated in *Oriti*. Accordingly, the claims were granted.

Prior to January of 1987, the drivers-helpers employed by Hi–State were compensated on a basis of an hourly wage and a commission on the number of cases of beverages sold at each of the stops. The combination of hourly wages, including overtime and the commission to be earned, provided income to the drivers-helpers in the amount of $35,000 to $40,000 per year. This figure was not controverted at the hearing below.

In January 1987, Hi–State implemented a different type of marketing procedure which it defined as "pre-sale." This involved the employment or utilization of existing salesmen to contact customers as to their requirements for the various types of products of the distributor, to make the sale accordingly, and then the next day the driver would simply deliver the exact amounts previously sold. The advantage of this type of operation to Hi–State was a more efficient operation in that the exact amount of product could be loaded on the trucks and delivered the following day with no necessity to load the truck with various types and amounts of products which may or may not be sold depending on the needs of the customers. This procedure obviated return of the trucks of unsold product and any attendant breakage or losses. Hi–State, at the hearing below, testified that the pre-sale method was adopted by the Coca Cola Company and Hill Distributing Company in Columbus, and was encouraged by their suppliers of the product as a more efficient manner of servicing their customers. This pre-sale method of operation was put into effect in January 1987 and was in effect on March 3, 1987 when, pursuant to the terms of the labor contract, the Union notified Hi–State of its intent to renegotiate the existing contract.

On April 2, 1987, Hi–State responded with its proposal in which it proposed to modify the form of compensation paid to the drivers-helpers by eliminating the commission that they had been receiving under the previous contract and going to a strictly hourly basis of compensation at $10 per hour. In addition, the warehousemen and other employees of Hi–State, who were currently

already on an hourly basis, were offered an increase in hourly compensation under the terms of this proposal.

The Union refused to accept either of these proposals and notified Hi–State that it was "adamantly" opposed to eliminating the commission basis of pay and would not negotiate on that point. On April 28, 1987, Hi–State communicated to the Union that it was increasing its proposed hourly rate by $.25 per hour as an attempt to break the impasse in negotiations. The Union rejected this offer. On May 11, 1987, Hi–State communicated with the Union and reaffirmed its position that the driver-helper-warehouse-forklift classifications be combined into a single driver-warehouse classification with all employees to be paid on an hourly basis and eliminating load limits. The Union adopted the position that these classifications could not be consolidated, and that the drivers-helpers would have to continue to be paid on a commission basis and formal load limits be continued. Negotiations were at an impasse.

By letter of May 29, 1987, Hi–State notified the Union that, as of May 28, Hi–State had presented its final offer which consisted of the April 2, 1987 proposal as modified by the proposal of April 28, 1987.

Albert A. Rossetti, testifying on behalf of Hi–State at the hearing, testified as follows:

"Q. The last bargaining session was on May 28th?

"A. Correct.

"Q. What happened at that session?

"A. The company presented its final proposal.

"Q. Did the union make any proposals?

"A. Yes, they presented theirs.

"Q. What was their proposal?

"A. Their proposal was to follow Columbus Distributing's present contract.

"Q. And under that contract Columbus Distributing's employees were paid on a, or drivers and helpers were paid on a commission basis?

"A. Yes.

"Q. Okay."

On midnight May 31, 1987, the Union set up a picket line at Hi–State's facility. Hi–State was not notified formally of the Union's vote to initiate a strike.

In anticipation of the Union's strike vote, Hi–State had solicited replacement employees on the contingency that they would be hired only in the event of a

strike and provided that the employees were qualified both with driver's licenses and for insurance purposes. These employees were instructed to report at 6:00 a.m., on June 1, 1987, and, at that time, they were not required to clock in. At 8:30 a.m., the normal start time, the number of pickets had increased to approximately ninety in front of Hi–State's facility, and none of the claimants had reported for work. At 8:45 a.m., the replacement employees were permitted to clock in, and then proceeded to begin working.

As previously stated, the board relied upon its finding of fact that the employees had offered to continue to work under the existing contract, as contemplated in the *Bays* and *Oriti* holdings. The only evidence concerning any offer to continue to work was that contained in the direct examination of Rossetti above stated. There was no offer made by the employees to continue to work under the existing contract. The offer to work under a contract such as the Columbus Distributing Company contract (incorrectly described in the board's decision as the "Coca Cola Company contract") does not rise to the level of an offer to continue to work under the existing contract between Hi–State and the Union. There is nothing in the record to indicate that the Columbus Distributing Company contract was in any way the same as the existing contract. There is nothing to indicate its terms and conditions, its rate of pay or the manner of payment, or any existing contractual requirements which would be the same as or different from the Hi–State contract. Accordingly, this court cannot construe that as an offer to continue to operate while negotiations continue. There is nothing in the record to indicate any other type of offer to continue work on behalf of the employees nor can one be inferred from any testimony contained in the record below.

This is an error on the part of the board and was a major predicate to its finding of the failure of the company to maintain a status quo. But for the finding by the board of the "offer to continue to work" on behalf of the employees, the board would have been required to look at other criteria for determining if there was a lockout. Under the existing definition of "lockout" contained in *Bays*, this court would find that there was not a lockout so as to remove the employees from operation of R.C. 4141.29(D)(1)(a).

Hi–State implemented the pre-sale procedure for marketing its product as a means of more efficient operation of its company. Testimony at the hearing below indicated that the cost of marketing to the company would be essentially the same in that, although the employee drivers-helpers were reduced from $35,000–$40,000 to $20,000–21,000 per year, the salaries of the salesmen were $25,000 a year so that the total cost of sale and delivery would be equal to or greater than the original cost under the labor contract. The savings to the company were realized, the testimony shows, by greater efficiency, fewer

deliveries, lower fuel costs, lower operation costs, less breakage, less returns and general overall efficiency of operation. These goals were consistent with the business objective of Hi–State and the pre-sale method of marketing was not implemented as a vehicle to coerce the drivers-helpers into a lower wage.

The board's holding that a lockout occurred by Hi–State is unsupported by the evidence which was produced at the hearing and upon which the board relied in rendering its decision.

Finally, the facts and holdings of *Zanesville* are applicable to this case. In *Zanesville*, the court stated:

"If the facts in this case had been that the request to continue work at reduced wages was made unexpectedly and without any opportunity for prior negotiations, we might be inclined to agree that such request was unreasonable. However, the undisputed facts in this case are that for at least two and a half months before the expiration of this contract the union was aware of the straitened circumstances of the company and of its announced intention not to continue the contract. * * *" *Id.*, 168 Ohio St. at 355, 7 O.O.2d at 122, 155 N.E.2d at 206.

Here, the Union was well aware for five months prior to initiating a strike of Hi–State's intention to change its method of marketing its product. However, the Union at no time would consider Hi–State's proposal or offer a counter proposal. As stated in *Bays, supra*, 53 Ohio St.3d at 134, 559 N.E.2d at 743:

" ' * * * [T]he sole test under * * * the Unemployment Compensation Law, * * * of whether the work stoppage is the responsibility of the employer or the employees is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? * * *" ' (Quoting *Erie Forge & Steel Corp., supra*, 400 Pa. at 444–445, 163 A.2d at 93–94.)

Applying the above test, this court would find that, based on the record below, the employees did not offer to continue work so as to avert a work stoppage and did, in fact, go out on strike, and that the employer was not offered the option of continuing to permit work for a reasonable time and, accordingly, did not agree to such continuance. Further, the employer presented adequate evidence of non-economic reasons for implementing the work compensation plan adopted and, when coupled with the five-month period in which the proposal was known to the employees, does not lead to the

conclusion that the employees could reasonably be expected to not accept the proposal and be required to leave work.

Therefore, we find that the board's holding that the claimants were initially separated from Hi–State's employ as a result of a lockout was unlawful, unreasonable and against the manifest weight of the evidence and, accordingly, the trial court was in error in affirming the decision of the board.

The first assignment of error is sustained.

■ The second assignment of error states:

"The common pleas court erred by affirming the board's holding that the claimants were separated from the company's employ due to a lack of work."

The board, in its decisions, held that the employees were all aware that permanent replacements had been hired and that, although the employer asserted that the positions were held open, this was for a matter of mere hours. The board further based its decisions on the fact that the employer " * * * took the affirmative action of notifying the union that the company was decertifying the union as a bargaining agent for employees. * * *" The board further found as both a finding of fact and a reasoning in its decision that, prior to the weeks in issue, the employer had taken an affirmative action to notify the claimants of the fact that they had been permanently replaced and that the Union was no longer recognized. Additionally, the board found that when employees attempted to return to work, they were not immediately re-employed, but were told they would be re-employed if and when the employer had positions available.

The transcript of the proceedings below and the exhibits offered and admitted into evidence do not support these findings of fact or holding of the court. The board is in error in relying upon these facts since they do not exist in the records.

The record does reveal that, in anticipation of the upcoming strike and in order to continue the operation of Hi–State because the workload was too great for the management staff, it was necessary for Hi–State to hire replacement employees. The testimony further reveals that the replacement employees were hired on a contingent basis, but that at the outset of the strike and, more specifically, at 8:45 in the morning of June 1, they were permitted to clock in and start to work. Further testimony contained in the transcript reveals that Hi–State did not advise the striking employees relative to their being replaced nor did it notify the striking employees that they had, in fact, been replaced. Further, testimony reveals that the striking employees were not advised that they had been terminated or discharged nor were they told that they would not have a job if they offered to return to work.

The testimony further revealed that Hi–State had determined to handle offers on the part of the employees to return to work on an individual basis as they came in or made an offer to return. Only two of the employees requested to return to work and neither of them offered to return to work on an unconditional basis or were qualified for positions which were open at the time that the offer was made. Hi–State further testified that, immediately after the strike began, openings did arise and that they, in fact, during the period from June 1987 to April 1989, had numerous vacancies which would have been filled by the striking employees if they had offered individually to return to work. The board premised its decision on the holding of *Baugh v. United Tel. Co.* (1978), 54 Ohio St.2d 419, 8 O.O.3d 427, 377 N.E.2d 766.

Contrary to the interpretation of the board, *Baugh* does not stand for the proposition that an employer terminates striking employees by the mere act of hiring replacements alone. The syllabus of *Baugh* has the operative clause, " * * * preventing any volition on the part of said employee to return to work * * *," as a qualifier to the act of hiring permanent replacement employees.

In *Baugh,* the employees refused to work on June 1, 1972 after a cooling-off period and the company did commence hiring permanent replacement employees. Of particular note at that point in time, each striking traffic employee received a second letter from the company shortly after June 1, 1972, advising the employee that he or she had been permanently replaced. Further, by letter, the employer had notified the union representative on May 25, 1972, of its intent to hire permanent replacements and, further, *if such employee did not report to work June 1, the immediate hiring of permanent replacements would commence and if at the end of the strike a replacement occupied the employee's former job, the employee had no job.* Finally, a second letter was sent to the employees shortly after the June 1 deadline informing them that their positions had been filled. Based upon this fact situation, the court found that the employees had been severed from employee status and that that severance was the proximate cause of the appellants' unemployment.

The facts above recited found in *Baugh* are at distinct variance with the facts contained in the caption case and, as such, *Baugh* is not as found by the board "directly on point with *Baugh.*"

First, unlike *Baugh,* striking employees received no letter or, for that matter, were they informed that the employees had been permanently replaced. Second, contrary to the facts of *Baugh,* Hi–State did not at any time advise each employee that if he did not report to work on June 1, the immediate hiring of a permanent replacement would commence nor, if at the end of the strike, that a replacement employee occupied his job, he would have

no job. To the contrary, the transcript reveals that the employees were not advised that they did not have jobs, and the position of Hi–State was that they would have jobs if job openings occurred subsequent to the strike's termination. Finally, contrary to the facts of *Baugh*, at no time were the employees advised that their positions had been filled and that they were no longer considered to be employees. To the contrary, they specifically were not notified of these facts and Hi–State's position was that they retained their status as employees.

Accordingly, it cannot be found from the existing facts and evidence contained in the record of this case that the employer terminated the claimants' status as employees.

Hi–State correctly states that under the National Labor Relations Act, Section 151 *et seq.*, Title 29, U.S.Code and in *Natl. Labor Relations Bd. v. Mackay Radio & Tel. Co.* (1938), 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381, the United States Supreme Court held that under the Act, an employer has the right to hire such replacements in order to protect and continue his business in the face of a strike. Recognizing that right, the court cautioned that the hiring of permanent replacements does not in and of itself result in the termination of employees on strike, declaring that strikers retain their status as employees after replacements have been hired. That is the precise status of this case.

*Baugh* established the proximate causation test to determine if, in fact, the actions of the employer in hiring replacements were the proximate cause of the lack of work for the employee. Having hired replacements, but reserving to the employees the right to return to work when openings occurred and, upon the unconditional offer of re-employment by Hi–State, when coupled with the fact that the employees remained on strike continually well after the filing of these claims, with the fact that none of the employees have sought to return to work, this court cannot say that the cause of the unemployment was due to lack of work as found by the board below.

Accordingly, this court finds that the board's holding that the claimants were separated from Hi–State's employ due to lack of work was unlawful, unreasonable and against the manifest weight of the evidence, and the decision of the common pleas court in affirming the decision of the board was in error.

Finally, the board, in its decision, placed significant emphasis on the fact that after receiving a petition from the new employees, Hi–State withdrew recognition of the Union, in effect holding that this act terminated the labor dispute. This holding is in error. Hi–State's withdrawal of recognition of the Union has absolutely no bearing on the employment status of the strikers and

in no way affects the reinstatement rights of strikers. Additionally, it does not terminate the labor dispute. The board's reliance on this fact as determining the June 19, 1987 termination of the labor dispute was in error.

Appellant's second assignment of error is sustained.

This court, having found the assignments of error to be well taken, remands this matter to the trial court with instructions to remand to the Ohio Unemployment Board of Review for further proceedings in accordance with this opinion.

*Judgment reversed*
*and cause remanded.*

BOWMAN, P.J., and STRAUSBAUGH, J., concur.

JAMES J. HOOPER, J., retired, of the Miami County Court of Common Pleas, was assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.