M. CONLEY COMPANY, APPELLANT, v. ANDERSON ET AL., APPELLEES.

[Cite as *M. Conley Co. v. Anderson,*
108 Ohio St.3d 252, 2006-Ohio-792.]

(No. 2004–1594—Submitted October 11, 2005—Decided March 8, 2006.)

**MOYER, C.J.**

{¶ 1} This appeal asks us to consider at what point the threat of, and actual hiring of, permanent replacement workers converts a labor dispute into a lockout for purposes of R.C. 4141.29(D)(1)(a). Appellant raises three interrelated propositions of law that we discuss together.

I

{¶ 2} In the early summer of 2002, the General Truck Drivers and Helpers Union Local 92 represented approximately 44 workers at the M. Conley Company. Nearing the expiration of its collective-bargaining agreement with M. Conley, the union and the employer engaged in a series of unsuccessful negotiations for a new contract. On the evening of June 30, 2002, the day before the agreement expired, the union members rejected the company's final proposals and voted to begin a strike the next day. Negotiations continued.

{¶ 3} During the first three weeks of the strike, the union received several letters from the company's agent and counsel, Craig T. Conley. Two letters, dated July 8 and July 19, are important to the disposition of the issue presented. A third letter, sent August 6, confirmed the July 19 letter. The first letter informed the strikers that "in order to continue and preserve our operations and business, please be advised that we are in the process of hiring permanent replacement drivers and warehouse workers (with the intention of retaining those new employees post-strike)." In the second letter, the company stated, "[I]t is our intention to retain those [permanent replacement] workers post-strike * * *. [W]e never intended to discharge all or most of those employees in order to 'make room' on the payroll for strikers who may, at some indefinite future date, suddenly decide to return to work. Further, * * * we have terminated and/or consolidated certain deliveries, which means that one or more previously existing driving positions have been eliminated."

{¶ 4} The August 6 letter confirmed that "all strikers have been permanently replaced; i.e., there currently are no employment positions open."

{¶ 5} In early August, striking workers applied for unemployment compensation benefits. A hearing officer of the Ohio Department of Job and Family Services determined that the workers were not entitled to unemployment benefits

from July 1 through July 19, 2002, because they were unemployed due to a labor dispute other than a lockout. The hearing officer found that after July 19, 2002, when the M. Conley Company hired permanent replacement workers, the striking workers were no longer unemployed because of a labor dispute other than a lockout and were entitled to unemployment compensation.

{¶ 6} The M. Conley Company appealed that decision to the Unemployment Compensation Review Commission, which declined review. The court of common pleas and appellate court subsequently affirmed the ruling of the hearing officer. This case is before us on a discretionary appeal.

## II

{¶ 7} R.C. 4141.29(D) provides:

{¶ 8} "[No] individual may serve a waiting period or be paid benefits * * *:

{¶ 9} "(1) For any week with respect to which the director finds that:

{¶ 10} "(a) The individual's unemployment was due to a labor dispute other than a lockout * * * for so long as the individual's unemployment is due to such labor dispute."

{¶ 11} We have previously analyzed this language. In *Baugh v. United Tel. Co.* (1978), 54 Ohio St.2d 419, 422, 8 O.O.3d 427, 377 N.E.2d 766, we held that "the words 'due to' mean 'caused by.' They do not mean merely 'occurring during the course of.' Thus, the element of causation is indispensable. Hence, the vital question is not whether the unemployment occurred in the course of the labor dispute, but whether the unemployment was caused by the labor dispute." Further, we held that "the General Assembly did not intend that the statutory disqualification from unemployment compensation benefits contained in R.C. 4141.29(D)(1)(a) be applicable if, during the course of a bona fide labor dispute, the employer terminated the employee status and thereby caused the unemployment." Id. at 424, 8 O.O.3d 427, 377 N.E.2d 766.

{¶ 12} In *Baugh*, workers went on strike in January. After the union rejected the employer's last proposal in May, the employer informed the workers that it would begin hiring permanent replacement workers effective June 1. The striking workers refused to return to work, and the employer began to hire permanent replacements. Subsequently, the company sent a second letter to each striking worker, informing them that their positions had been filled. We held that the hiring of permanent replacement workers terminated the striking workers' employee status and was the proximate cause of the strikers' unemployment, entitling them to unemployment compensation. Id. at 425, 8 O.O.3d 427,

377 N.E.2d 766. The issue presented for appeal is similar to the issue we decided in *Baugh*.

## III

{¶ 13} Appellant relies on *Natl. Labor Relations Bd. v. Mackay Radio & Tel. Co.* (1938), 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381, for the proposition that the hiring of replacement workers does not itself terminate the employment relationship. The cause of action in *Mackay* arose under the National Labor Relations Act [1] and relates to unfair labor practices. Unlike the *Mackay* court, we are not asked to determine the striking workers' status under federal law in the context of an alleged unfair labor practice, but rather under Ohio law in the context of unemployment compensation.

{¶ 14} Appellant also cites two Ohio court of appeals cases for the proposition that hiring replacement workers does not by itself entitle striking workers to unemployment compensation. We do not disagree with that conclusion, but in both cited cases, striking workers did not receive notice of their replacement. "[T]estimony reveals that the striking employees were not advised that they had been terminated or discharged nor were they told that they would not have a job if they offered to return to work." *Hi–State Beverage Co. v. Ohio Bur. of Emp. Servs.* (1991), 77 Ohio App.3d 633, 641, 603 N.E.2d 274. "Employees were never informed that they had been replaced; they did not receive a second letter informing them that they had been replaced as did the employees in *Baugh* [54 Ohio St.2d 419, 8 O.O.3d 427, 377 N.E.2d 766]." *Moriarity v. Elyria United Methodist Home* (1993), 86 Ohio App.3d 502, 506, 621 N.E.2d 576. Here, the employer gave clear notice in its July 19 letter that the employees had been replaced: "[I]t is our intention to keep [the replacement] workers post-strike. * * * [W]e never intended to discharge all or most of those employees in order to 'make room' on the payroll for strikers." The cited cases are factually distinguishable from the case at bar.

## IV

{¶ 15} In affirming the eligibility of the striking workers for unemployment benefits, the court of appeals relied upon our holding in *Bays v. Shenango Co.* (1990), 53 Ohio St.3d 132, 559 N.E.2d 740. At issue in *Bays* was whether the employees' failure to report for work was a strike or a lockout. In *Bays* we

---

1. Section 158, Title 29, U.S.Code.

adopted a "status quo" test to determine which party, the union or the employer, was responsible for the work stoppage. At the final negotiation session between the union and the employer, the union offered to keep working under the existing contract for another year while negotiations continued. The employer countered that the employees could continue to work only under the employer's new terms. When the employees rejected that offer and failed to come to work the next day, the employer blamed the work stoppage on the union, claiming that it was a strike. The union argued that the work stoppage was the employer's fault, and the union workers had been locked out.

{¶ 16} We adopted the status quo test to determine which party had first altered the working relationship. That test " 'is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout" and the disqualification of unemployment compensation benefits in the case of a "stoppage of work because of a labor dispute" does not apply.' " *Bays*, 53 Ohio St.3d at 134, 559 N.E.2d 740, quoting *Erie Forge & Steel Corp. v. Unemp. Comp. Bd. of Review* (1960), 400 Pa. 440, 444–445, 163 A.2d 91.

{¶ 17} The *Bays* status quo test is to be used when there is a dispute over the actual cause of the work stoppage and to identify which party was responsible for that work stoppage. Ohio appellate courts have generally followed that holding. See *Anderson v. Ohio Bur. of Emp. Serv.* (Nov. 16, 1999), Franklin App. No. 99AP-207, 1999 WL 1034214.

{¶ 18} The court of appeals misapplied our holding in *Bays* to the case at bar.[2] Here, there is no doubt that Local 92 was responsible for the original work stoppage. The workers voted to strike and made it known to the general public that they were on strike. There is no status quo to measure. Rather, the court of appeals should have applied our holding in *Baugh*.

{¶ 19} The present case is nearly identical to *Baugh*. Local union 92 initiated a strike. In an effort to force the striking workers to accept its terms, the company threatened to hire permanent replacement workers and subsequently followed through on that threat. Finally, on July 19, 2002, the company sent

2. The union does not dispute that it initiated a strike. As it acknowledges its responsibility for the work stoppage and has not requested unemployment compensation benefits for its members for the period of July 1 through July 19, we are not required to apply the *Bays* test to this case.

notice to the striking workers that their jobs had been permanently filled. Applying the law of *Baugh* to these facts, we conclude that the employees may not be denied the benefits provided by R.C. Chapter 4141 for the period following July 19, 2002.

{¶ 20} Appellant avers that the striking workers should be required to reapply for their jobs before we can determine that their positions have been permanently filled and they are entitled to unemployment compensation. We will not require striking workers who receive written notice that they have been permanently replaced to reapply in person.

## V

{¶ 21} We reaffirm our holding in *Baugh* and hold that the hiring of permanent replacement workers coupled with notice to striking workers that they have been replaced or that their positions have been permanently filled severs the employee relationship for purposes of R.C. 4141.29(D)(1)(a) and removes the disqualification to receive unemployment compensation benefits.

{¶ 22} Although we do not adopt the rationale in its opinion, the judgment of the court of appeals is affirmed.

Judgment affirmed.

RESNICK, PFEIFER, O'CONNOR and LANZINGER, JJ., concur.

LUNDBERG STRATTON and O'DONNELL, JJ., concur separately.

-----

**LUNDBERG STRATTON, J., concurring.**

{¶ 23} I concur in the decision reached in this case because of our precedent established in *Baugh v. United Tel. Co.* (1978), 54 Ohio St.2d 419, 8 O.O.3d 427, 377 N.E.2d 766. *Baugh* was decided in 1978 and established a definition in a labor dispute of the phrase "due to." Id. at 422, 8 O.O.3d 427, 377 N.E.2d 766. The conclusion in *Baugh* was that an employer could create eligibility for unemployment compensation by permanently ending the striking workers' ability to return. Id. at syllabus.

{¶ 24} The M. Conley Company argues that such a position unfairly alters the status quo and eventually removes the financial penalties of a strike, creating an unequal playing field by subsidizing strikers with unemployment compensation at the employer's cost. Such an argument certainly has merit. However, *Baugh*, which we follow today, established the legal interpretation for R.C. 4141.29(D)(17)(a) in 1978. The legislature is free to amend or clarify this statute

at any time if the legislature disagrees with our interpretation, yet it has not done so. Any change sought by employers should be directed to the legislature, not this court. Therefore, while acknowledging the merits of the employer's position, I do not believe that it is this court's role to dictate unemployment policy. Therefore, I concur in the majority's opinion.

O'DONNELL, J., concurs in the foregoing opinion.

---

Craig T. Conley, for appellant.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, Stephen P. Carney, Senior Deputy Solicitor, and Laurel Blum Mazorow, Assistant Attorney General, for appellee Ohio Department of Job and Family Services.

Ulmer & Berne, L.L.P., and Barton A. Bixenstine; Squire, Sanders & Dempsey, L.L.P., William A. Nolan, and Jonathan E. Sullivan, urging reversal for amicus curiae, Ohio Management Lawyers' Association.