DAIDO METAL BELLEFONTAINE, L.L.C., Appellant,

v.

DIR., OHIO DEPARTMENT OF JOB AND FAMILY SERVICES et al., Appellees.

[Cite as *Daido Metal Bellefontaine, L.L.C. v. Ohio Dept. of Job & Family Servs.*, 180 Ohio App.3d 537, 2009-Ohio-86.]

Court of Appeals of Ohio,
Third District, Logan County.

No. 8–08–14.

Decided Jan. 12, 2009.

Ronald L. Mason and Aaron T. Tulencik, for appellant.

Patria V. Hoskins, for appellee Director, Ohio Department of Job and Family Services.

Frederick G. Cloppert Jr., for appellees United Auto Workers Local 1224.

Per Curiam.

{¶ 1} Plaintiff-appellant Daido Metal Bellefontaine, L.L.C. ("Daido") appeals from the June 11, 2008 judgment entry of the Court of Common Pleas, Logan County, Ohio, affirming the decision of the Unemployment Compensation Review Commission. Defendant-appellees in this matter are the Ohio Department of Job and Family Services ("ODJFS") and the United Auto Workers Local 1224 ("Local 1224").

{¶ 2} This matter stems from the employment of members of Local 1224 at Daido, located in Bellefontaine, Ohio. Daido manufactures parts for the automotive industry, and it appears from the record that most of Daido's employees are union members.[1]

{¶ 3} The collective-bargaining agreement between Daido and the members of Local 1224 was set to expire on June 29, 2007. Prior to the expiration of the agreement, the members of Local 1224 voted to authorize a work stoppage.

{¶ 4} Negotiations occurred with the goal of reaching a new collective-bargaining agreement, with 11 negotiations sessions held from May 2007 to August 6, 2007. During this time, both Daido and Local 1224 proposed various plans to extend the collective-bargaining agreement, with each plan being rejected by the other party.

{¶ 5} At the core of the difficulty in reaching a collective-bargaining agreement is an apparent desire by Daido to achieve concessions in the areas of wages,

---

1. Daido employs approximately 220 individuals. Of those employees, approximately 170–180 are members of Local 1224.

health-care coverage, pension, rules, and contract language. These concessions sought are due to losses that the company has suffered, as well as Daido's stated concern over projected losses.

{¶ 6} The members of Local 1224 worked, despite the expiration of the collective-bargaining agreement on June 30, 2007. However, on July 1, 2007, the members voted to begin a work stoppage on July 2, 2007. The work stoppage and picketing began on July 2, 2007.

{¶ 7} On July 11, 2007, Daido sent a letter to Local 1224 and all striking employees, which provided as follows.

As you know, the issue of whether or not these strikers are economic strikers or unfair labor practice strikers is not up to you or the Company, but the National Labor Relations Board. We feel quite confident that given all the facts in this case, the NLRB will hold this strike to be an economic strike and that the Company can lawfully hire permanent replacements.

To that end, this letter will put you on notice that this week the Company has in fact hired some permanent replacements. However, until all the jobs are filled, anyone who wants to cross the picket line will be put to work. The Company has work available for them to perform.

{¶ 8} The ODJFS received approximately 123 claims for unemployment based on this dispute between Local 1224 and Daido. A hearing was held on those claims, pursuant to R.C. 4141.283 on August 7, 2007. A decision by a hearing officer was issued on August 17, 2007, and reasoned as follows:

Also, under the Baugh decision as reaffirmed in the M. Conley Co. decision, the totality of the testimony and evidence indicates that Daido Metal ended the employer-employee relationship with the members of Local 1224 by hiring fifteen (15) permanent replacements, and notifying the members of Local 1224 in writing on July 11, 2007, and thereby severed the labor dispute as the proximate cause of unemployment (see the final paragraph of page 2 of Employer Exhibit 1).[2]

In addition, Daido Metal referenced the possibility of permanent replacements and the consequences of what would occur if permanent replacements were hired in two (2) letters sent to members of Local 1224 prior to the beginning of the work stoppage (See Employer Exhibit 5 and Union Exhibit A).[3]

---

**2.** This citation refers to the second paragraph of the excerpt from the July 11, 2007 letter from Daido quoted above.

**3.** {¶ a}In a letter dated May 25, 2007 from Daido to the employee members of Local 1224 the company stated:

Furthermore, the employers witness again provided forthright and highly credible testimony regarding the displacement of members of Local 1224 because of the fact that permanent replacements have been hired and of the prospective hiring of more permanent replacements (see pages 41–43 of the transcript).[4]

The assertion that Daido Metal has not permanently replaced any specific member of Local 1224 is unpersuasive. Permanent replacement is a term that has clear and unambiguous meaning. The decision by Daido Metal to hire permanent replacements coupled with notice to the members of Local 1224 has definitive legal consequences under Ohio Unemployment Law as evidenced by the Ohio Supreme Court decisions in Baugh and M. Conley Co.

Consequently, it is the conclusion of this Hearing Officer that the claimants in this matter were unemployed due to a labor dispute other than a lockout which began July 2, 2007, and ended July 11, 2007 when Daido Metal notified the members of Local 1224 that the hiring of permanent replacements had begun.

Decision: It is the decision of this Hearing Officer that all of the Claimants herein were unemployed due to a labor dispute other than a lockout at Daido Metal which began July 2, 2007. The Claimants are disqualified from receiving unemployment compensation benefits due to a labor dispute other than a lockout for the week that includes July 2, 2007, pursuant to Section 4141.29(D)(1)(a) of the Ohio Revised Code.

It is also the decision of this Hearing Officer that the labor dispute other than a lockout between Local 1224 and Daido Metal began July 2, 2007, and

---

{¶ b}"As an economic striker, you can be permanently replaced. You will continue to maintain your status as an employee, but you need to understand that *permanent replacement workers have the right to continue to work in your place even after the strike ends.*

{¶ c}"If your position is filled by a permanent replacement while you are on strike, you can return to work if and when your permanent replacement leaves the company or when a job, for which you are qualified, becomes available." (Emphasis sic).

{¶ d}In a letter dated June 8, 2007, from Daido to the employee members of Local 1224, Daido informed the union members "if you cross a picket line and return to work, you cannot be permanently replaced if the Union is on an economic strike."

4. {¶ a}Joanne Daum, Daido's Human Resource Manager, testified that Daido had hired approximately 15 permanent replacements and that Daido planned on hiring in the near future, although Daum was not sure whether Daido would hire replacement workers or temporary workers.

{¶ b}Daum testified that none of these replacements were hired to replace any specific striking employee. Additionally, Daum testified that if the striking workers went back to work, there would be work still available to them. With respect to available positions, Daum testified that because some people quit their employment with Daido during the strike, she was not sure whether 15 striking workers would be displaced if they all returned to work, as she believed it might be less.

ended on July 11, 2007, when Daido Metal began hiring permanent replacements.

(Footnotes added.)  Decision on Labor Dispute Issue, August 17, 2007.

{¶ 9} Daido subsequently sought leave to appeal to the Unemployment Compensation Review Commission.  In a decision mailed November 2, 2007, the Unemployment Compensation Review Commission disallowed Daido's application for an appeal of the hearing officer's decision.  On November 28, 2007, Daido instituted an appeal in the Logan County Court of Common Pleas.

{¶ 10} On March 26, 2008, Daido filed a memorandum in support of its appeal. Local 1224 filed a brief in opposition on April 25, 2008, and ODJFS filed their brief in opposition on April 20, 2008.  Daido subsequently filed a reply brief.

{¶ 11} On June 11, 2008, the trial court, in a judgment entry, relying predominately on the analysis of the hearing officer, affirmed the decision of the Unemployment Compensation Review Commission.

{¶ 12} Daido now appeals, asserting a single assignment of error.

### ASSIGNMENT OF ERROR

The court below erred by affirming the hearing officer's decision to award unemployment compensation to the strikers based upon the severing of the employer-employee relationship, because the relevant case law indicates both the hearing officer and the lower court rulings were unlawful, unreasonable, and against the manifest weight of the evidence.

{¶ 13} In its sole assignment of error, Daido argues that the court of common pleas erred by affirming the decision of the hearing officer, awarding unemployment compensation to the strikers.  Specifically, Daido argues that the award of unemployment compensation to the strikers was unlawful, unreasonable, and against the manifest weight of the evidence.

{¶ 14} R.C. Chapter 4141 sets forth the statutory framework for unemployment compensation.  R.C. 4141.282(H) requires a common pleas court to uphold a decision of the Unemployment Compensation Review Commission unless the decision is found to be unlawful, unreasonable, or against the manifest weight of the evidence.  *Gossard v. Ohio Dept. of Job & Family Servs.*, 3rd Dist. No. 6–04–06, 2004-Ohio-5098, 2004 WL 2260107, at ¶ 8.  In reviewing the review commission's decision, an appellate court must apply the same standard of review as the lower court.  *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.* (1995), 73 Ohio St.3d 694, 653 N.E.2d 1207, at paragraph one of the syllabus. " 'While appellate courts are not permitted to make factual findings or to determine the credibility of witnesses, they do have the duty to determine whether the board's decision is supported by the evidence in the record.' "

*Gossard,* 2004-Ohio-5098, 2004 WL 2260107, at ¶ 8, quoting *Tzangas, Plakas &
Mannos* at 696, 653 N.E.2d 1207. As a court of review, we are constrained to
make our decision based solely on the evidence developed at the administrative
level and on the applicable law. *Gossard,* 2004-Ohio-5098, 2004 WL 2260107, at
¶ 8.

██ {¶ 15} In the present case, the sole issue before this court is whether the
hearing officer properly found that the claimants were entitled to workers'
compensation benefits. Typically, an individual is not entitled to unemployment
compensation when unemployment is "due to a labor dispute other than a lockout
* * * for so long as the individual's unemployment is due to such labor dispute."
R.C. 4141.29(D)(1)(a). There appears to be no disagreement between the parties
that the claimants were, at least initially, unemployed due to a labor dispute.

{¶ 16} All parties to this case rely on and cite several decisions of the Ohio
Supreme Court, as well as several decisions of other courts of appeals, as
controlling the present case. We find that a review of these cases is necessary to
understand the decision of the hearing officer, as well as the reliance of the
parties on each specific case.

{¶ 17} In *Baugh v. United Tel. Co.* (1978), 54 Ohio St.2d 419, 8 O.O.3d 427, 377
N.E.2d 766, the Ohio Supreme Court articulated a new test for determining
when, during the course of a bona fide labor dispute, the employer terminated the
employee-employer relationship. In *Baugh,* after the union employees com-
menced an economic strike, they were informed by letter that if they did not
return to work by a specified date, they would be permanently replaced. *Baugh,*
54 Ohio St.2d at 420, 8 O.O.3d 427, 377 N.E.2d 766. Shortly after the deadline to
return to work passed, each striking employee received a letter notifying them of
their permanent replacement. Id.

{¶ 18} In analyzing the *Baugh* scenario, the Ohio Supreme Court noted that
the disqualification contained in R.C. 4141.29(D)(1)(a) applied only if unemploy-
ment was due to a labor dispute. The court found the phrase "due to" to mean
"caused by," not "merely 'occurring during the course of.'" *Baugh,* 54 Ohio St.2d
at 422, 8 O.O.3d 427, 377 N.E.2d 766. Therefore, the fact that unemployment
began during the course of a labor dispute was not an ultimate bar to ever
receiving unemployment compensation.

{¶ 19} In formulating a test for when unemployment due to a labor dispute,
which is not compensable, turned into something for which unemployment
benefits could be awarded, the court focused on when the employer acted to sever
the employment relationship. The court found as follows:

Accordingly, we find that the General Assembly did not intend that the
statutory disqualification from unemployment compensation benefits contained

in R.C. 4141.29(D)(1)(a) be applicable if, during the course of a bona fide labor dispute, the employer terminated the employee status and thereby caused the unemployment. In such an instance, although the labor dispute directly caused the initial unemployment, the statutory disqualification terminated with the severance of the employee status. At that moment in time the direct cause of the unemployment became the act of the employer. From then on the employer's action and not the labor dispute was the proximate cause of unemployment.

Thus, pivotal to the resolution of the instant cause is a determination of whether the employer terminated the appellants' status as employees.

*Baugh*, 54 Ohio St.2d at 424, 8 O.O.3d 427, 377 N.E.2d 766.

{¶ 20} In determining whether the employer in *Baugh* terminated the employees, the Ohio Supreme Court concluded as follows: "[S]ince the employer's action of permanent replacement prevented any volition on the part of the workers to return to work and since it severed the labor dispute as the cause of unemployment, the statutory disqualification provision of R.C. 4141.29 is inapplicable to bar appellants' right to receive unemployment compensation benefits." *Baugh*, 54 Ohio St.2d at 425, 8 O.O.3d 427, 377 N.E.2d 766. Accordingly, in *Baugh*, the Supreme Court found the following facts to be determinative of the question:

In the instant causes, we are confronted with the affirmative action of the employer in notifying the appellants pursuant to a letter, dated May 25, 1972, not only that their union representatives had been informed of the employer's intention to hire permanent replacements, but further that, if each employee did not report to work on June 1, the immediate hiring of permanent replacements would commence and, if at the end of the strike a replacement occupied the employee's former job, the employee had no job. A second letter was sent to the employees shortly after the June 1 deadline, informing them that their positions had been filled.

*Baugh* at 425, 8 O.O.3d 427, 377 N.E.2d 766. Based on these facts, the Supreme Court determined that "*[t]he only possible conclusion* that can be drawn from these facts is that the employer's severance of the employee status was the proximate cause of appellants' unemployment." (Emphasis added.) Id.

{¶ 21} The Ohio Supreme Court revisited the *Baugh* test in *M. Conley Co. v. Anderson*, 108 Ohio St.3d 252, 2006-Ohio-792, 842 N.E.2d 1037. In *M. Conley*, the employees went on strike on the day the collective-bargaining agreement expired. *M. Conley* at ¶ 2. Similar to the *Baugh* case, during the course of the strike, the employees received several letters from M. Conley. Id. at ¶ 3. The first letter informed the strikers that the company was in the process of hiring replacement workers. Id. In a second letter, the employees were notified that it was the intention of the company to retain replacement workers after the strike

ended. Id. The final letter to the employees acted as a confirmation that all employees had been replaced. Id. at ¶ 4.

{¶ 22} The *M. Conley* court noted that its factual scenario was nearly identical to *Baugh* and reaffirmed the *Baugh* holding as follows:

[T]he hiring of permanent replacement workers coupled with notice to striking workers that they have been replaced or that their positions have been permanently filled severs the employee relationship for purposes of R.C. 4141.29(D)(1)(a) and removes the disqualification to receive unemployment compensation benefits.

*M. Conley Co.*, 108 Ohio St.3d 252, 2006-Ohio-792, 842 N.E.2d 1037, ¶ 21.

{¶ 23} Moreover, the *M. Conley* court, when it discussed factually distinguishable cases, implicitly approved the proposition that "hiring replacement workers does not by itself entitle striking workers to unemployment compensation." *M. Conley Co.*, 108 Ohio St.3d 252, 842 N.E.2d 1037, ¶ 14. The cases that the court in *M. Conley* found to be factually distinguishable were *Moriarity v. Elyria United Methodist Home* (1993), 86 Ohio App.3d 502, 621 N.E.2d 576, and *Hi–State Beverage Co. v. Ohio Bur. of Emp. Servs.* (1991), 77 Ohio App.3d 633, 603 N.E.2d 274.[5]

{¶ 24} In *Moriarity*, a group of employees went out on strike. They had been informed in a memo, prior to the strike, that it was the intention of the employer to immediately permanently replace anyone who went on strike. *Moriarity*, 86 Ohio App.3d at 503, 621 N.E.2d 576. The pre-strike memo also stated that any employee could continue to work and offered transportation for employees crossing the picket line. Id. On the first day of the strike, the employer began hiring permanent replacements, with members of the striking union also crossing the picket lines to work. The *Moriarity* court noted specifically that "[n]o members of Local 47 were refused jobs during the strike." Id.

{¶ 25} In determining whether the employees were entitled to unemployment compensation, in *Moriarity*, the court focused on the proximate causation test as articulated in *Baugh*. The court found that "the hiring of replacements was not the proximate cause of the striking employees' unemployment," because there was no showing that the hiring of replacements prevented any volition on the part of the striking workers to return to work. *Moriarity*, 86 Ohio App.3d at 507, 621 N.E.2d 576. The court further relied on the following factors as indicators that the claimants were not terminated from their jobs: "(1) the home informed the claimants that they would be able to return to work after the strike if a position

---

**5.** Although the Ohio Supreme Court distinguished these cases, factually, from *M. Conley*, it did not overrule these cases or cast doubt on their holdings in any way. Instead the court acknowledged that the different outcomes were the result of factual differences.

was available, or as positions became available; (2) those employees who were not returned to work immediately after the strike were placed on a preferential recall list and (3) seventy-one employees were returned to work immediately following the strike." Id., citing *Hi–State*, 77 Ohio App.3d at 642–643, 603 N.E.2d 274.

{¶ 26} In further reliance on the fact that no individual claimant had actually shown unemployment, the *Moriarity* court concluded as follows:

> Each claimant had the burden of showing that he was entitled to unemployment compensation. None of the claimants has shown that the home's actions terminated his employment status thereby becoming the direct cause of his unemployment preventing any volition on his part to return to work. Accordingly, we find that the common pleas court abused its discretion by reversing the decision of the board which was lawful, reasonable and supported by the evidence.

(Citations omitted.) Id.

{¶ 27} In *Hi–State*, the employees went on an economic strike after their positions were modified to eliminate payments for sales commissions. The employer hired replacements during the strike, but did not inform the striking workers that replacements had been hired, or that they had been "terminated or discharged." *Hi–State*, 77 Ohio App.3d at 641, 603 N.E.2d 274. The employees were also not told that they would not have jobs if they opted to return to work, as the employer had determined that it would handle offers to return to work on a case-by-case basis. Id. Moreover, after the strike ended, some employees did return to work. Id.

{¶ 28} The *Hi–State* court distinguished the facts of its case from *Baugh*, finding that the Hi–State employees received no notice that they had been replaced; and moreover, they were not informed that any replacements would be retained after the strike. Finally, the court noted that "*Baugh* does not stand for the proposition that an employer terminates striking employees by the mere act of hiring replacements alone. The syllabus of *Baugh* has the operative clause, '* * *preventing any volition on the part of said employee to return to work * * *,' as a qualifier to the act of hiring permanent replacement employees." *Hi–State*, 77 Ohio App.3d at 642, 603 N.E.2d 274, quoting *Baugh*, 54 Ohio St.2d 419, 8 O.O.3d 427, 377 N.E.2d 766, at syllabus. Therefore, the *Hi–State* court determined that it could not attribute the unemployment of the workers to the actions of the employer.

{¶ 29} Finally, in a more recent decision, the Twelfth District Court of Appeals considered *Magnode Corp. v. Ohio Dept. of Job & Family Servs.*, 12th Dist. No. 2005–02–050, 2006-Ohio-3086, 2006 WL 1673138. In *Magnode*, the employees were verbally notified shortly after beginning the strike that the employer would begin the process of hiring permanent replacements. *Magnode*, 2006-Ohio-3086,

2006 WL 1673138, ¶ 3. After notification, the employer followed through on its notification and began hiring permanent replacements. Id.

{¶ 30} In determining that the *Magnode* employees were not entitled to unemployment compensation, the court relied upon the fact that although replacement workers were hired, jobs were available for the workers until the time the strike ended. *Magnode*, 2006-Ohio-3086, 2006 WL 1673138, ¶ 13. The *Magnode* court found this to be an indicator that the employer did not sever the employment relationship with the striking workers by merely beginning to hire replacement workers. Id. However, the court did not indicate at what point in hiring permanent replacements the employment relationship would be severed.

{¶ 31} Finally, the court, in *Magnode*, observed that the workers were never sent, as in *M. Conley* and *Baugh*, a notice informing them that they had been permanently replaced. Id. Thus, the court concluded that the *Magnode* workers were not entitled to unemployment compensation.

{¶ 32} In the present case, Daido would have us construe these cases as ruling that nothing less than the permanent replacement of every striking worker, coupled with formal written notice thereof to every worker, would constitute a severance of the employee status proximately caused by the employer. Daido then argues that the circumstances and notice of "some" permanent replacements given to the striking workers in this case was not sufficient to establish such a severance. Instead, Daido argues that this case is more factually analogous to *Moriarity, Hi–State*, and *Magnode*.

{¶ 33} Alternatively, Local 1224 and the ODJFS argue that Daido's July 11, 2007 letter to the union stating that "the company has hired some permanent replacements," coupled with the further statement that "until all the jobs are filled, anyone who wants to cross the picket line will be put to work," was sufficient to sever the employment relationship in this case, especially in conjunction with the evidence that the company had permanently replaced 15 workers and was considering plans to hire more.

{¶ 34} At the outset, we note that of the approximately 175 union positions at Daido, the evidence indicates that 15 permanent replacements have been hired to fill these positions. There has been no notice to the employees concerning which positions have been replaced specifically, nor has Daido notified the striking workers or otherwise indicated its unequivocal intent to permanently replace all of the striking workers. On the contrary, the testimony on behalf of Daido indicated only that 15 permanent replacements had been hired and that Daido was planning to hire more replacements, which might be permanent and/or temporary. In addition, due to the resignation of some striking workers, the evidence was not clear how many of the striking workers might actually have

been displaced by the 15 permanent replacements, but that the number would most likely be less than 15.

{¶ 35} Local 1224 and the hearing officer for ODJFS appear to rely heavily upon the phrase from the Daido letter of July 11, 2007, quoted above, stating that *"until all positions are filled,* anyone who wants to cross the picket line will be put to work" as unequivocal evidence that Daido intends to permanently replace each and every striking worker. However, we cannot find that this evidence rises to the level of certainty required by the Ohio Supreme Court in *Baugh* and *M. Conley,* wherein the Supreme Court found that *"[t]he only possible conclusion"* that could be drawn from the facts in that case was that the employer had severed the employee status. (Emphasis added.) *Baugh,* 54 Ohio St.2d at 425, 8 O.O.3d 427, 377 N.E.2d 766.

{¶ 36} Moreover, we construe the holdings in *M. Conley* and *Baugh* to stand for the proposition that the hiring of *some* replacement workers does not by itself entitle striking workers to receive unemployment compensation. *M. Conley,* 108 Ohio St.3d 252, 842 N.E.2d 1037, ¶ 14. As a result, we do not find the proposition advanced by Local 1224 and ODJFS that the hiring of *some* permanent replacements coupled with a statement of plans to replace others was sufficient to sever the employment status of the striking workers under any of the case authority set forth above.

{¶ 37} At the same time, we do not construe these decisions to necessarily support the proposition urged by Daido that the employment status for purposes of unemployment compensation cannot be severed by the employer as a matter of law until each and every striking worker has been permanently replaced and individually notified thereof. In sum, there may be a point at which enough replacement workers are hired, coupled with the appropriate notification and declaration of future intent by the employer to permanently replace the remaining workers, so that the employer has effectively severed the employment relationship as to all the striking workers in a given case. However, we cannot find that the evidence supports that conclusion in the present case. In other words, it is our conclusion that on the evidence thus far, the determination of the hearing officer and the trial court that the employment relationship had been severed by Daido was premature.

{¶ 38} Accordingly, we find the conclusions of the hearing officer and the trial court to be both contrary to standards of law, as articulated in *Baugh* and *M. Conley,* and against the manifest weight of the evidence.

{¶ 39} Based on the foregoing, Daido's assignment of error is sustained, and the June 11, 2008 judgment entry of the Court of Common Pleas, Logan County, Ohio, affirming the decision of the Unemployment Compensation Review Com-

mission, is reversed. The case is remanded for further proceedings consistent with this opinion.

Judgment reversed<br>
and cause remanded.

PRESTON, P.J., and ROGERS and SHAW, JJ., concur.