[Cite as *U.S. Tsubaki, Inc. v. Dir., Ohio Dept. of Job & Family Servs.*, 2016-Ohio-851.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

U.S. Tsubaki, Inc.

Court of Appeals No. E-15-009

    Appellant/Cross-Appellee

Trial Court No. 2012-CV-0510

v.

Director, Ohio Department of Job &
Family Services, et al.

**DECISION AND JUDGMENT**

    Appellee/Cross-Appellant

Decided:  March 4, 2016

* * * * *

Robert E. Dezort and William E. Blackie, for appellant/cross-appellee.

Mike DeWine, Ohio Attorney General, and Eric A. Baum, Managing
Attorney, for appellee/cross-appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} This is an appeal and cross-appeal of the judgment of the Erie County Court

of Common Pleas, affirming the decision of the Unemployment Compensation Review

Commission, which disallowed an appeal from the hearing officer's award of

unemployment compensation benefits to 86 employees of appellant/cross-appellee, U.S. Tsubaki, Inc. ("UST"). For the reasons that follow, we affirm, in part, and reverse, in part.

## I. Facts and Procedural Background

{¶ 2} The background facts are not in dispute. UST operates a manufacturing plant in Sandusky, Ohio, that employs approximately 125 workers, 94 of whom are members of the International Association of Machinists and Aerospace Workers.

{¶ 3} On January 30, 2011, a three-year collective bargaining agreement was set to expire. Prior to that deadline, management and the union negotiating team reached a tentative agreement. However, that agreement was voted down by the union members, and a separate vote was held to go on strike beginning January 31, 2011, at midnight. Third shift workers reported for work at 11:00 p.m. on January 30, 2011, worked for one hour, then began to strike. Negotiations continued, and a second tentative agreement was reached on February 10, 2011. However, this agreement was also rejected by the union membership. At no time did either UST or the union offer to continue employment under the terms of the recently expired collective bargaining agreement.

{¶ 4} Initially following the strike, UST attempted to maintain its operations with its management and supervisory employees along with workers from some of its other facilities. After some time, UST could no longer maintain its operations in this fashion, and it made the decision to hire replacement workers. An advertisement was placed in the local newspaper seeking workers. The ad did not specify whether the employment

2.

was permanent or temporary. On February 18, 2011, the first replacement workers were hired. For the next several days, UST hired approximately seven to nine workers per day. At the time of the unemployment compensation hearing on March 14, 2011, 72 replacement workers were on UST's payroll.

{¶ 5} At the hearing, Thomas Barton, a senior vice president of UST, testified that the replacement workers were permanent replacements, specifying that they were directly hired by UST and that they displaced the striking employees. However, he stated that if any striking worker offered to return to work under the terms and conditions of the expired contract, UST would allow them to come back for one of the positions still available. Barton testified that of the 88 original positions,[1] there may be fewer than 16 still available as UST has realized through an operational analysis that it may be able to reduce the total head count. At the time of the hearing, no striking worker had crossed the picket line or offered to return to work.

{¶ 6} Barton further testified that UST never advised the union or any striking employee that he or she would not be able to continue working under the terms and conditions of the expired contract, nor did UST verbally, or in writing, notify the union or any striking employee that he or she had been permanently replaced or that his or her job no longer existed. Barton continued, testifying that no striking employee has been

---

[1] Although there were 94 union members, approximately six of them were on disability or some other type of leave, resulting in only 88 positions.

3.

terminated since the work stoppage began, and that there are still positions available that could be filled by qualified striking employees.

{¶ 7} Following Barton's testimony, three documents were entered into evidence. The first and second documents were the first and second tentative agreements, respectively. The third document was a tally sheet that tracked how many replacement workers were hired each day beginning on February 18, 2011. No other evidence or testimony was presented at the hearing.

{¶ 8} On March 24, 2011, the hearing officer entered his decision, finding that the claiming employees were unemployed due to a labor dispute other than a lockout beginning on January 31, 2011, but that UST severed the labor dispute as the cause of the unemployment on February 18, 2011, when it began hiring permanent replacement workers. In reaching its conclusion, the hearing officer took official notice of an advertisement placed in the local newspaper, and relied on such notice, coupled with the testimony from the hearing in the presence of nearly two dozen claimants, to find that the intent was to permanently replace the striking employees beginning on February 18, 2011. The hearing officer commented that "Any other interpretation would be tantamount to approval of a legal fiction." Therefore, the hearing officer concluded that the claimants were entitled to unemployment compensation benefits beginning February 18, 2011.

**{¶ 9}** UST appealed the hearing officer's decision to the Unemployment Compensation Review Commission, which disallowed the appeal after a review of the entire record.

**{¶ 10}** UST then filed an administrative appeal in the Erie County Court of Common Pleas. In the trial court, UST argued that the Commission's decision was unlawful, unreasonable, and against the manifest weight of the evidence. As support for its argument, UST cited the lack of any notice sent to the union or to the striking employees, notifying them that they were terminated, that their positions were permanently filled, or that UST intended to hire permanent replacements. Furthermore, UST relied on the testimony from the hearing that there has been work available since the beginning of the strike, and that positions still existed which could be filled by qualified striking employees.

**{¶ 11}** Appellees/cross-appellants, the Director of the Ohio Department of Job and Family Services and the 86 claimants (collectively referred to as "ODJFS"), argued that the issue of notice was secondary to the issue of intent, and the intent of UST to permanently replace the striking employees was clear. ODJFS further argued that sufficient notice was given to the striking employees through newspaper advertisements and articles.

**{¶ 12}** On review, the trial court affirmed, in part, and reversed, in part, the decision of the Commission. The court reasoned that written notice to striking employees that they are being terminated is not a required element to find that the employees are

5.

entitled to unemployment compensation. However, the court also rejected the notion that notice is unimportant, finding that it is a critical factor that "illuminates the employer's intent to permanently replace the striking worker and sever the employment relationship. Notice may also shed light on whether the employee has any volition in returning to work."

{¶ 13} The court found that, in this case, traditional written notice to the employees was lacking. Further, the trial court found that the newspaper advertisements were inadequate because "a striking employee could not tell from reading the advertisement that his/her job was being permanently filled and that if they decided to report to work, they'd be refused work." However, the trial court found that Barton's testimony that 72 of the less than 88 positions had been permanently filled demonstrated UST's intent to terminate the striking workers, and the fact that the testimony was offered in front of two dozen striking employees constituted sufficient notice to the claimants. Therefore, the trial court affirmed the Commission's decision that the claimants were entitled to unemployment compensation benefits, but determined that eligibility for those benefits began on the date of the hearing, March 14, 2011, instead of February 18, 2011.

## II. Assignments of Error

{¶ 14} UST has appealed the judgment of the trial court asserting one assignment of error:

> The trial court erred, as a matter of law, by failing to set aside the
>
> Decision of the Ohio Department of Job and Family Services, affirmed by

6.

the Unemployment Compensation Review Commission, granting unemployment compensation benefits to striking employees who were unemployed as a result of a labor dispute other than a lockout, as said Decision was unlawful, unreasonable, and/or against the manifest weight of the evidence.

{¶ 15} ODJFS likewise has cross-appealed the trial court's judgment, also asserting a single assignment of error for our review:

The trial court's sole role is to determine whether the review commission's decision is supported by some competent, credible evidence in the record, even documentary evidence. In unemployment appeals, the rules of evidence do not apply. Here, the trial court ignored the February 18, 2011 newspaper article, where Mr. Manty stated that the replacements were permanent, because the article was not discussed at the hearing. This cherry-picking of the evidence constitutes reversible fact finding.

### III. Analysis

{¶ 16} The parties' assignments of error both concern the review of the Commission's decision, thus we will address them together.

{¶ 17} We review the Commission's decision under the same standard as the trial court. *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d 694, 696-697, 653 N.E.2d 1207 (1995) (the statute setting forth the appeals process for unemployment compensation cases "does not create distinctions between the scope of

7.

review of common pleas courts and appellate courts"). "The board's role as factfinder is intact; a reviewing court may reverse the board's determination only if it is unlawful, unreasonable, or against the manifest weight of the evidence." *Id.* at 697.

{¶ 18} R.C. 4141.29 governs an individual's eligibility and qualification to receive unemployment compensation benefits. Relevant here, R.C. 4141.29(D)(1)(a) provides:

> (D) Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits under the following conditions:
>
> (1) For any week with respect to which the director finds that:
>
> (a) The individual's unemployment was due to a labor dispute other than a lockout at any factory, establishment, or other premises located in this or any other state and owned or operated by the employer by which the individual is or was last employed; and for so long as the individual's unemployment is due to such labor dispute.

{¶ 19} Here, the parties do not contest that the claimants' initial unemployment was due to a labor dispute other than a lockout. Rather, the issue we must resolve is whether UST's actions severed the labor dispute as the cause of the unemployment, thereby entitling the claimants to unemployment compensation benefits, and if so, when such severance occurred.

{¶ 20} The parties cite six Ohio cases that comprise the body of case law on this issue. In the first, *Baugh v. United Tel. Co.*, 54 Ohio St.2d 419, 377 N.E.2d 766 (1978), paragraph one of the syllabus, the Ohio Supreme Court held,

8.

Where, during the course of a bona fide labor dispute, the employer terminates the employer-employee relationship through his affirmative action of replacing the striking employee, preventing any volition on the part of said employee to return to work, the employer thereby has severed the labor dispute as the proximate cause of unemployment, and the statutory disqualification provision, R.C. 4141.29(D)(1)(a), is inapplicable as a bar to the right to receive unemployment compensation benefits.

{¶ 21} In that case, the employees received a letter from the company informing them that unless they returned to work by June 1, the company would commence hiring permanent replacement workers. The employees refused to return to work. Shortly thereafter, each striking employee received a second letter from the company informing the employee that he or she had been permanently replaced. On July 31, a strike settlement was reached, under which the company agreed to return the employees to full-time employment only when the permanent replacements terminated their relationship with the company. Until all the employees could be returned on a full-time basis, they would work every third week. *Id.* at 420.

{¶ 22} The administrative hearing officer found that the employees were not disqualified from receiving unemployment compensation benefits. That decision was affirmed by the Board of Review. The court of common pleas, however, reversed the administrative decision, and the court of appeals affirmed the judgment of the court of

9.

common pleas.  On appeal, the Ohio Supreme Court reversed, and held that the employees were entitled to unemployment compensation benefits.

{¶ 23} The court reasoned that the disqualification provision only applies if "unemployment was due to a labor dispute."  *Id.* at 422.  Finding that the words "due to" mean "caused by," not merely "occurring during the course of," the court recognized that the vital question is "whether the unemployment was caused by the labor dispute."  *Id.*  Specifically, the court sought to determine "whether the employer terminated the appellants' status as employees."  *Id.* at 424.

> In such an instance, although the labor dispute directly caused the initial unemployment, the statutory disqualification terminated with the severance of the employee status.  At that moment in time the direct cause of the unemployment became the act of the employer.  From then on the employer's action and not the labor dispute was the proximate cause of unemployment.  *Id.*

Confronted with the affirmative action of the employer notifying the employees of its intention to hire permanent replacements, and its second letter informing the employees that their positions had been filled, the court held that "[t]he only possible conclusion that can be drawn from these facts is that the employer's severance of the employee status was the proximate cause of appellant's unemployment."  *Id.* at 425.

10.

{¶ 24} Subsequently, in *Hi-State Beverage Co. v. Ohio Bur. of Emp. Servs.*, 77 Ohio App.3d 633, 603 N.E.2d 274 (10th Dist.1991), the Tenth District distinguished *Baugh*, and held that the employer did not terminate the striking employees, thereby leaving them disqualified from receiving unemployment compensation benefits. In that case, the employees went on strike on June 1. In anticipation of the strike, the employer hired replacement workers on a contingent basis. Once the strike began, the replacement workers were allowed to begin working. Testimony from the transcript revealed that the striking employees were not notified that they had been replaced, nor were they told that they were terminated or discharged or that they would not have a job if they offered to return to work. The employer determined that it would handle offers to return to work on an individual basis, testifying that it had numerous vacancies that would have been filled by the striking employees. However, only two striking employees requested to return and neither offered to return on an unconditional basis or was qualified for positions which were open at the time.

{¶ 25} The Ohio Bureau of Employment Services administrator found that the employees were entitled to unemployment benefits, finding that the labor dispute ended on June 19. The Unemployment Compensation Review Board agreed, holding that since the employer replaced the employees, their unemployment was due to a lack of work, not a labor dispute. The trial court affirmed the decision of the board. On appeal, the Tenth District reversed.

11.

{¶ 26} The court reasoned that *Baugh* did not stand for the proposition that "an employer terminates striking employees by the mere act of hiring replacements alone," recognizing that the syllabus in *Baugh* contains the operative clause "'preventing any volition on the part of said employee to return to work,'" which is "a qualifier to the act of hiring permanent replacement employees." *Id.* at 642, quoting *Baugh*, 54 Ohio St.2d 419, 377 N.E.2d 766, at syllabus. Further, the court distinguished the facts before it from those in *Baugh*, noting that the striking employees received no letter nor were they otherwise informed that they had been permanently replaced, they were not informed that if they did not return to work then permanent replacements would be hired to fill their jobs, and finally, they were not advised that their positions had been filled or that they were no longer considered employees. Therefore, the court held that the record did not support the finding that the employer terminated the claimants' status as employees. *Hi-State* at 643.

{¶ 27} Likewise, in *Moriarity v. Elyria United Methodist Home*, 86 Ohio App.3d 502, 621 N.E.2d 576 (9th Dist.1993), the Ninth District distinguished *Baugh*, and held that striking employees were not entitled to unemployment compensation benefits. In that case, the employees went on strike on March 22. Prior to the strike, the employer sent a memorandum to the employees that "it is the intention of the [employer] to permanently replace any employee who participates in the strike immediately." The memo also stated that any employee may continue to work during the strike and that the employer hopes that the employees choose to do so, even offering to provide

12.

transportation and assistance for those employees who wanted to cross the picket line. The employer began hiring replacement workers on the first day of the strike. During the strike, 11 striking employees crossed the picket line and were returned to work. No striking employee was refused a job during the strike. On May 12, a settlement agreement was signed and the strike ended. 71 of the 111 employees still on strike were returned to work. The remaining employees were put on a preferential recall list. *Id.* at 503-504.

{¶ 28} The Ohio Bureau of Employment Services administrator granted the claims for unemployment compensation, but the Unemployment Compensation Board of Review reversed. Thereafter, the trial court reversed the decision of the board, but was reversed on appeal to the Ninth District, which upheld the board's determination that the claimants were not entitled to unemployment compensation benefits.

{¶ 29} The court agreed with the board that the hiring of replacements was not the proximate cause of the striking employees' unemployment. The court noted that, unlike in *Baugh*, the claimants were not notified that they were permanently replaced. In addition, none of the claimants sought to return to work, nor did they show that they would have been refused work had they attempted to return. To the contrary, those employees who did attempt to return to work were given jobs. Furthermore, the court cited as evidence that the claimants were not terminated from their jobs the fact that

> the [employer] informed the claimants that they would be able to return to
>
> work after the strike if a position was available, or as positions became

13.

available; (2) those employees who were not returned to work immediately after the strike were placed on a preferential recall list and (3) seventy-one employees were returned to work immediately following the strike. *Id.* at 507.

Thus, the court concluded that none of the claimants had shown that he or she had been terminated, thereby becoming the direct cause of his or her unemployment preventing any volition on his or her part to return to work. *Id.*

{¶ 30} Thereafter, the Ohio Supreme Court weighed in on the subject once again in *M. Conley Co. v. Anderson*, 108 Ohio St.3d 252, 2006-Ohio-792, 842 N.E.2d 1037, syllabus, holding that "The hiring of permanent replacement workers coupled with notice to striking workers that they have been replaced or that their positions have been permanently filled severs the employee relationship for purposes of R.C. 4141.29(D)(1)(a) and removes the disqualification to receive unemployment compensation benefits."

{¶ 31} There, union members went on strike on July 1.  On July 8, the company sent a letter informing the strikers that "in order to continue and preserve our operations and business, please be advised that we are in the process of hiring permanent replacement drivers and warehouse workers (with the intention of retaining those new employees post-strike)."  On July 19, the company sent a second letter, stating,

[I]t is our intention to retain those [permanent replacement] workers post-strike * * *.  [W]e never intended to discharge all or most of those

14.

employees in order to "make room" on the payroll for strikers who may, at some indefinite future date, suddenly decide to return to work. Further, * * * we have terminated and/or consolidated certain deliveries, which means that one or more previously existing driving positions have been eliminated.

Finally, on August 6, the company sent a letter confirming that "all strikers have been permanently replaced; i.e., there currently are no employment positions open." *Id.* at ¶ 3-4.

{¶ 32} A hearing officer of the Ohio Department of Job and Family Services determined that the workers were entitled to unemployment compensation benefits beginning on July 19, when the permanent replacement workers were hired. The Unemployment Compensation Review Commission declined review. The decision was then affirmed by both the court of common pleas and the appellate court. Upon appeal to the Ohio Supreme Court, the court affirmed.

{¶ 33} In its decision, the court noted that *Hi-State* and *Moriarity* stand for the proposition that "hiring replacement workers does not by itself entitle striking workers to unemployment compensation." *Id.* at ¶ 14. While the court "[did] not disagree with that conclusion," it nonetheless found that *Hi-State* and *Moriarity* were distinguishable because in both of those cases the striking workers "did not receive notice of their replacement." *Id.* Instead, the court found that the facts were nearly identical to those in *Baugh* in that the employer threatened to hire permanent replacement workers and

15.

subsequently followed through on that threat, sending notice to the striking workers that their jobs had been permanently filled. Therefore, the court held that the striking workers may not be denied unemployment compensation benefits for the period beginning July 19. *Id.* at ¶ 19.

{¶ 34} After *M. Conley*, Ohio appellate courts again were confronted with the issue on two occasions, each time distinguishing *Baugh* and *M. Conley*, and finding that the employees were not entitled to unemployment compensation benefits.

{¶ 35} In *Magnode Corp. v. Ohio Dept. of Job & Family Servs.*, 12th Dist. Butler No. CA2005-02-050, 2006-Ohio-3086, the employees went on strike in March 2001. On March 22, 2001, the employer verbally notified the employees that it would begin the process of hiring permanent replacement workers. On March 28, 2001, the employer sent written notice that it intended to hire replacement workers if the union failed to ratify the latest proposed collective bargaining agreement. After the union failed to ratify the proposal, the employer began hiring permanent replacements on April 2, 2001. *Id.* at ¶ 3.

{¶ 36} The hearing officer for the Ohio Unemployment Compensation Review Commission determined that the employees were entitled to unemployment compensation beginning April 2, 2001. The decision was eventually appealed to the trial court, which reversed, finding that although the employer began hiring permanent replacements on April 2, 2001, positions were still available for striking employees through the end of the strike, and the employees were never notified in writing that their positions had been permanently filled. The Twelfth District affirmed. The court held

16.

that the employer did not sever the employment relationship by merely beginning to hire replacement workers, noting that positions were available throughout the strike period and ten employees crossed the picket line and returned to work. Further, the court cited with approval the trial court's recognition that "unlike the employer in *Baugh*, [the employer] never sent the striking employees a second letter informing them that their positions had been permanently replaced or that they no longer had a job." *Id.* at ¶ 13. Therefore, the court concluded that the employees were unemployed due to a labor dispute other than a lockout and were not entitled to receive unemployment compensation benefits. *Id.*

{¶ 37} Similarly, in *Daido Metal Bellefontaine, L.L.C. v. Ohio Dept. of Job & Family Servs.*, 180 Ohio App.3d 537, 2009-Ohio-86, 906 N.E.2d 458 (3d Dist.), the employees went on strike on July 2. Previously, on May 25, the employer had sent a letter to the employees, stating,

> As an economic striker, you can be permanently replaced. You will continue to maintain your status as an employee, but you need to understand that *permanent replacement workers have the right to continue to work in your place even after the strike ends.*
>
> If your position is filled by a permanent replacement while you are on strike, you can return to work if and when your permanent replacement leaves the company or when a job, for which you are qualified, becomes available. (Emphasis sic.) *Id*. at ¶ 8, fn. 3.

17.

**{¶ 38}** On July 11, the employer sent another letter to the striking employees, notifying them that "the Company has in fact hired some permanent replacements. However, until all the jobs are filled, anyone who wants to cross the picket line will be put to work. The Company has work available for them to perform." *Id.* at ¶ 7.

**{¶ 39}** Approximately 123 employees filed claims for unemployment compensation benefits. The hearing officer determined that the employees were entitled to unemployment compensation beginning on July 11. The hearing officer reasoned that the hiring of 15 permanent replacement workers, coupled with the July 11 written notice of that fact and the hearing testimony that the employer intended to hire more permanent replacements, led to the conclusion that the employer had severed the employment relationship. The Unemployment Compensation Review Commission disallowed an appeal from the hearing officer's decision. The trial court, predominately relying on the hearing officer's analysis, affirmed the decision of the Commission. The Third District reversed.

**{¶ 40}** In its decision, the court rejected the argument that the hiring of some replacement workers—specifically 15 out of 175 union positions—in conjunction with the further statement that "until all the jobs are filled, anyone who wants to cross the picket line will be put to work," was sufficient to sever the employment relationship. The court noted that there was no notice to the employees as to which positions had been filled, nor had there been notification of the employer's unequivocal intent to permanently replace all of the striking workers. Thus, the court concluded that the

18.

evidence did not rise to the level of certainty present in *Baugh* that "*[t]he only possible conclusion*" was that the employer had severed the employee status. (Emphasis sic.) *Id.* at ¶ 35, quoting *Baugh*, 54 Ohio St.2d at 425, 377 N.E.2d 766.

{¶ 41} However, the court did not go so far as to adopt the employer's position that the employment relationship was not severed until each and every striking worker had been permanently replaced and individually notified thereof. Instead, the court reasoned that "there may be a point at which enough replacement workers are hired, coupled with the appropriate notification and declaration of future intent by the employer to permanently replace the remaining workers, so that the employer has effectively severed the employment relationship as to all the striking workers in a given case," but that the threshold was not met in the case before it. *Id.* at ¶ 37. Therefore, the court held that the employees were not entitled to unemployment compensation benefits.

{¶ 42} Turning to the arguments of the parties before us, UST contends, in its direct appeal, that the case law requires written notice to each claimant that he or she has been permanently replaced as a prerequisite to finding that the employment relationship has been severed and the labor dispute is no longer the proximate cause of the unemployment. In so doing, UST distinguishes the present case from *Baugh* and *M. Conley*, which included written notice to the employees that they had been permanently replaced, and analogizes it to *Hi-State*, *Moriarity*, and *Magnode*, which did not include such written notice. ODJFS, on the other hand, while conceding that actual notice of the employer's intent to permanently replace the employees is required, argues that there is

19.

nothing mandating that the notice must be in writing. Further, ODJFS contends that notice was met in this case through a February 25, 2011 memorandum from UST, the hearing testimony, the newspaper advertisement, and statements from the president of UST in a February 19, 2011 newspaper article. Finally, ODJFS argues that *Hi-State*, *Moriarity*, *Magnode*, and *Daido* are inapposite because the employers in those cases did not permanently end the striking employees' ability to return to work.

{¶ 43} In addition, in its cross-appeal, ODJFS argues that the trial court erred and acted as a finder of fact when it determined that the lockout began on March 14, 2011, instead of February 18, 2011, as determined by the hearing officer. ODJFS states that the February 18, 2011 date is supported in the record by the statements of UST's president made in the February 19, 2011 newspaper article. According to ODJFS, it is inconsequential that the article was not discussed at the hearing, so long as it is contained in "the certified record provided by the [c]ommission." *See* R.C. 4141.282(H) ("The court shall hear the appeal on the certified record provided by the commission."). UST counters that it is improper for this court to consider the February 19, 2011 newspaper article (and the February 25, 2011 memorandum) because those documents were not introduced at the hearing and were not considered by the hearing officer.[2] Moreover, even if those documents are considered, they do not rise to the level of actual written

---

[2] As noted by the trial court, it is unknown how and why the documents appear in the administrative record.

notice to the claimants that their positions had been filled or that they had been terminated.

{¶ 44} Upon our consideration of the parties' arguments and the relevant case law, we disagree with UST's proposition that written notice of termination or permanent replacement is a required element to finding that the employee is entitled to unemployment compensation benefits. As articulated in *Baugh*, "Where, during the course of a bona fide labor dispute, the employer terminates the employer-employee relationship through his affirmative action of replacing the striking employee, preventing any volition on the part of said employee to return to work, the employer thereby has severed the labor dispute as the proximate cause of unemployment * * *." *Baugh*, 54 Ohio St.2d 419, 377 N.E.2d 766, at syllabus. Thus, the touchstone issue identified by the court is "whether the employer terminated the appellants' status as employees," not whether the employees have received notice. *Id.* at 424. We agree with the trial court that written notice illuminates the employer's intent and can provide evidence of the fact of termination, and we recognize that in *Baugh* and *M. Conley*, the termination of the claimants' status as employees was made evident through letters indicating that *all* of their positions had been permanently filled. However, we do not read *Baugh* and *M. Conley* as requiring written notice as the *only* method by which to prove termination.

{¶ 45} Here, the hearing officer determined that the claimants were, in reality, terminated by UST when it began hiring permanent replacement workers on February 18, 2011. While we reject ODJFS' argument that we should consider evidence that was not

21.

entered at the hearing nor relied upon by the hearing officer, we nonetheless hold that the Commission's decision is supported by competent, credible evidence. Specifically, the Commission's decision is supported by Barton's testimony that although a few positions remain open, nearly all of the striking employees' jobs have been permanently filled by replacement workers—a "very good possibility" that fewer than 16 of 88 positions remained. In that way, the present case is distinguishable from *Hi-State* ("numerous vacancies" that could be filled by striking workers), *Moriarity* (employees informed they could work during the strike, eleven employees crossed the picket line and returned to work, and after the strike 71 of 111 employees returned to work immediately), *Magnode* (positions were available for striking workers throughout the strike, and 10 of 58 workers crossed the picket line and returned to work), and *Daido* (only 15 permanent replacements hired for a total of approximately 175 union positions), and is similar to *Baugh* and *M. Conley* (all of the employees were permanently replaced).

{¶ 46} We recognize that this is a close case, and that there is evidence from the hearing suggesting that the employment relationship was not terminated, namely Barton's testimony that no employee was refused work, positions remained open that could be filled by qualified workers, and that the employees were not notified that they had been terminated or permanently replaced. However, the fact of termination was determined by the hearing officer, and based on the record adduced at the hearing, we cannot say that the conclusion that UST severed the employment relationship as of February 18, 2011, is unlawful, unreasonable, or against the manifest weight of the evidence.

22.

**{¶ 47}** Accordingly, UST's assignment of error is not well-taken.  Further, ODJFS' assignment of error on cross-appeal is well-taken.

## IV.  Conclusion

**{¶ 48}** For the foregoing reasons, the judgment of the Erie County Court of Common Pleas is affirmed, in part, and reversed, in part.  The trial court's modification of the eligibility date to March 14, 2011, for unemployment compensation benefits is reversed, and the decision of the Commission is affirmed in its entirety.  Pursuant to App.R. 24, UST is ordered to pay the costs of this appeal.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.            _____
                                                           JUDGE

Arlene Singer, J.                

                                                 _____
Thomas J. Osowik, J.                                                JUDGE
CONCUR.

                                                 _____
                                                           JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.